IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

ROBERT L. ROSE,

        Plaintiff,

      v.                       Civil Action No. 3:07-CV-53

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I. Introduction

A.    Background

Plaintiff, Robert L. Rose, (Claimant), filed his Complaint on May 2, 2007 seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) and 1381(c)(3) of an adverse decision by

Defendant, Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer

on July 12, 2007.[2]  Claimant filed his Motion for Summary Judgment on August 10, 2007.[3]

Commissioner filed his Motion for Summary Judgment on September 7, 2007.[4]

B.    The Pleadings

    1.    Plaintiff's Brief In Support of His Motion for Summary Judgement

    2.    Defendant's Brief In Support of Motion For Summary Judgment

---

[1] Docket No. 1.

[2] Docket No. 10.

[3] Docket No. 13.

[4] Docket No. 17.

C.    Recommendation

I recommend that:

1.    Claimant's Motion for Summary Judgment be DENIED because the ALJ properly determined the severity of Claimant's Borderline Intellectual Functioning and cervical spinal defects as well as properly determined Claimant's RFC and posed an accurate hypothetical to the Vocational Expert.

2.    Commissioner's Motion for Summary Judgment be GRANTED because the ALJ properly determined the severity of Claimant's Borderline Intellectual Functioning and cervical spinal defects as well as properly determined Claimant's RFC and posed an accurate hypothetical to the Vocational Expert.

## II.  Facts

A.    Procedural History

Claimant filed an application for Supplemental Security Income Benefits and Disability Insurance Benefits on August 29, 2003 and September 5, 2003, respectively, alleging disability since December 31, 2001.  His application was initially denied on December 11, 2003 and upon reconsideration on March 19, 2004.  Claimant requested a hearing before an Administrative Law Judge, ["ALJ"], and received a hearing on February 22, 2005.  On April 15, 2005, the ALJ issued a decision adverse to Claimant.  Claimant requested review by the Appeals Council but was denied.  Claimant filed this action, which proceeded as set forth above.

B.    Personal History

Claimant was 39-years-old on the date of the February 22, 2005 hearing before the ALJ. Claimant completed tenth grade and has prior work experience as a trash collector, automobile

mechanic, dump truck driver and construction laborer/rigger.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ

concluded Claimant was not under a disability: December 31, 2001 through April 15, 2005.

**Dr. Susan Long, M.D., 9/11/03 (Tr. 165)**
Assessment: The patient is status post right inguinal hernia repair doing very well.

**Lois Holloway, M.S., 11/3/03 (Tr. 171)**
Test Results and Impressions
Vocabulary: 5
Similarities: 5
Arithmetic: 5
Digital Span: 5
Information: 5
Comprehension: 5
Letter Number Sequencing: 12
Verbal Mean: 5

Picture completion: 4
Digit Coding:3
Block Design: 6
Matrix Reasoning: 4
Picture Arrangement: 8
Performance Mean: 5
Symbol Search: 5

Verbal IQ: 70
Performance IQ: 69
Full Scale IQ: 67
Verbal Comprehension Index: 72
Perceptual Organization Index: 69
Working Memory Index: 63

Discussion: Although Mr. Rose was cooperative, there did appear to be anxiety related blocking
and behavior inhibition which is felt to have somewhat depressed his performance on the WAIS-
III.  Therefore, results are not considered valid and to slightly underestimate Mr. Rose's level of
cognitive functioning which is felt to be within the Borderline range.  External validity factors
such as employment history and obtaining his driver's test by written test are consistent with this
observation.

<u>WRAT-3</u>
Subject: Standard Score - 68; Grade Score - 4
Reading: Standard Score - 64; Grade Score - 4
Spelling: Standard Score - 55; Grade Score - 2

It is likely these results slightly underestimate Mr. Rose's educational achievement for the same reasons as stated above.

<u>Diagnosis</u>
     Axis I: 303.90 Alcohol Dependence; 300.00 Anxiety Disorder NOS.
     Axis II: v62.89 Borderline Intellectual Functioning
     Axis III: Reported back and neck pain; s/p hernia repair.

**Dr. Arutoru Sabio, M.D., 11/11/03 (Tr. 176)**
<u>Diagnostic Impression</u>: Osteoarthritis and chronic back and neck strain; degenerative disk disease.

**Eli Rubenstein, M.D., 11/12/03 (Tr. 181)**
<u>Impression</u>: Slight narrowing of L-5 S-1, L-4 L-5.

**Dr. Joseph Kuzniar, 12/8/03 (Tr. 183)**
<u>Psychiatric Review Technique</u>
Medical Dispositions: RFC Assessment Necessary
Category(ies) upon which the medical disposition is based: 12.02 Organic Mental Disorders;
     12.06 Anxiety-related disorders; 12.09 Substance Addiction Disorders
Organic Mental Disorders: A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: BIF
Anxiety Related Disorders: Anxiety as the predominate disturbance or anxiety experience in the
     attempt to master symptoms, as evidenced by at least one of the following: Generalized
     persistent anxiety accompanied by three of the following - motor tension, or autonomic
     hyperactivity, or apprehensive expectation.
Substance Addiction Disorders:
Functional Limitation for Listings 12.02, 12.06, 12.07
     Restriction of Activities of Daily Living: Moderate
     Difficulties in Maintaining Social Functioning: Moderate
     Difficulties in Maintaining Concentration, Persistence or Pace: Moderate
     Episodes of Decompensation, each of extended duration: None
"C" Criteria of the Listings: Evidence does not establish the presence of the "C" Criteria

**DDS Physician, 12/8/03 (Tr. 198)**
<u>Mental RFC Assessment</u>
<u>Understanding and Memory</u>:
Ability to remember locations and work-like procedure: not significantly limited
Ability to understand and remember very short and simple instructions: not significantly limited

Ability to understand and remember detailed instructions: markedly limited

<u>Sustained concentration and persistence</u>

Ability to carry out very short and simple instructions: not significantly limited

Ability to carry out detailed instructions: markedly limited

Ability to maintain attention and concentration for extended periods: moderately limited

Ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances: moderately limited

Ability to sustain an ordinary routine without special supervision: not significantly limited

Ability to work in coordination with or proximity to others without being distracted by them: moderately limited

Ability to make simple work-related decisions: not significantly limited

Ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistence pace without an unreasonable number and length of rest periods: moderately limited.

<u>Social Interaction</u>

Ability to interact appropriately with the general public: not significantly limited

Ability to ask simple questions or request assistance: not significantly limited

Ability to accept instructions and respond appropriately to criticism from supervisors: not significantly limited

Ability to get along with coworkers and peers without distracting them or exhibiting behavioral extremes: moderately limited

Ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited

<u>Adaptation</u>

Ability to respond appropriately to changes in the work setting: moderately limited

Ability to be aware of normal hazards and to take appropriate precautions: not significantly limited

Ability to travel in unfamiliar places or use public transportation: not significantly limited

Ability to set realistic goals or make plans independently of others: not significantly limited

Functional Capacity Assessment: the Claimant retains the capacity to at least understand, remember, and carry out 1-2 step instructions within a very low social interaction demand work setting. His capacity for adaptation is as rated in Section I-D.

**<u>Dr. Thomas Lauderman, D.O., 12/10/03 (Tr. 202)</u>**

<u>Physical RFC Assessment</u>

Exertional Limitations

       Occasionally - 50 pounds

       Frequently - 25 pounds

       Stand and/or walk - about 6 hours in an 8-hour workday.

       Sit - about 6 hours in an 8 hour workday

       Push and/or pull - unlimited, other than as shown for lift and/or carry

Postural Limitations: none established

Manipulative Limitations: none established

Visual Limitations: none established
Communicative Limitations: none established
Environmental Limitations: Avoid concentrated exposure of extreme cold, heat, and hazards.
Symptoms: RFC reduced to medium for pain and fatigue.
Comments: Recovered with shuffling gait, all considered. RFC reduced to sedentary because of obesity, pain and fatigue.

**William R. Sharpe Hospital, 2/13/04 (Tr. 211)**
Final Diagnosis
Axis I: Alcohol dependence; intermittent explosive disorder.
Axis II: No diagnosis.
Axis III: History of chronic back pain secondary to injury in past. Otherwise no ongoing
                 medical problem.

**Dr. Nitin Malik, M.D., 1/26/04 (Tr. 216)**
Diagnostic Impression:
Axis I: Alcohol dependence; Possible Intermittent Explosive Disorder; Substance Induced
                 Depressive Disorder.
Axis II: Rule out Borderline Intellectual Functioning.
Axis III: Back Injury; Abnormal right TM; Multiple self-inflicted cuts on forearm.
Axis IV: Legal charges; relationship problems.

**Dr. James Capage, 3/16/04 (Tr. 223)**
Psychiatric Review Technique
Medical Dispositions: RFC Assessment Necessary
Category(ies) upon which the medical disposition is based: 12.02 Organic Mental Disorders;
        12.08 Personality Disorders.
Personality Disorders: Intermittent Explosive Disorder
Functional Limitation for Listings 12.02, 12.06, 12.07
        Restriction of Activities of Daily Living: Mild
        Difficulties in Maintaining Social Functioning: Mild
        Difficulties in Maintaining Concentration, Persistence or Pace: Moderate
        Episodes of Decompensation, each of extended duration: None

**Dr. James Capage, 3/16/04 (Tr. 238)**
Psychiatric Review Technique
Medical Dispositions: Meets 12.09 B
Category(ies) upon which the medical disposition is based: 12.02 Organic Mental Disorders;
        12.04 Affective Disorders; 12.08 Personality Disorders; 12.09 Substance Addiction
        Disorders.
Organic Mental Disorders: BIF
Affective Disorders: Bipolar I Disorder, depressed without psychosis.
Personality Disorders: Intermittent Explosive Disorder
Substance Addiction Disorders: Listing 12.04 Affective Disorder

Functional Limitation for Listings 12.02, 12.06, 12.07
  Restriction of Activities of Daily Living: Moderate
  Difficulties in Maintaining Social Functioning: Marked
  Difficulties in Maintaining Concentration, Persistence or Pace: Marked
  Episodes of Decompensation, each of extended duration: One or Two

**DDS Physician, 3/16/04 (Tr. 252)**

Mental RFC Assessment

Understanding and Memory:

Ability to remember locations and work-like procedure: not significantly limited

Ability to understand and remember very short and simple instructions: not significantly limited

Ability to understand and remember detailed instructions: markedly limited

Sustained concentration and persistence

Ability to carry out very short and simple instructions: not significantly limited

Ability to carry out detailed instructions: markedly limited

Ability to maintain attention and concentration for extended periods: moderately limited

Ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances: not significantly limited

Ability to sustain an ordinary routine without special supervision: not significantly limited

Ability to work in coordination with or proximity to others without being distracted by them: moderately limited

Ability to make simple work-related decisions: not significantly limited

Ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistence pace without an unreasonable number and length of rest periods: moderately limited.

Social Interaction

Ability to interact appropriately with the general public: not significantly limited

Ability to ask simple questions or request assistance: not significantly limited

Ability to accept instructions and respond appropriately to criticism from supervisors: not significantly limited

Ability to get along with coworkers and peers without distracting them or exhibiting behavioral extremes: not significantly limited

Ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited

Adaptation

Ability to respond appropriately to changes in the work setting: moderately limited

Ability to be aware of normal hazards and to take appropriate precautions: not significantly limited

Ability to travel in unfamiliar places or use public transportation: not significantly limited

Ability to set realistic goals or make plans independently of others: not significantly limited

Functional Capacity Assessment: Were the Claimant not alcohol dependent, MER would indicate severe mental impairments (BIF, Intermittent Explosive Disorder) that do not meet nor equal the Listings. (See PRT #2). These impairments do impose moderate limitations upon

functioning as reflected by the ratings of Part I, above. It seems that he would retain the mental - emotional capacity to perform unskilled work-related activities.

**DDS Physician, M.D., 3/17/04 (Tr. 256))**
Physical RFC Assessment
Exertional Limitations
       Occasionally - 50 pounds
       Frequently - 25 pounds
       Stand and/or walk  - about 6 hours in an 8-hour workday.
       Sit - about 6 hours in an 8 hour workday
       Push and/or pull - unlimited, other than as shown for lift and/or carry
Postural Limitations: none established
Manipulative Limitations: none established
Visual Limitations: none established
Communicative Limitations: none established
Environmental Limitations: Avoid concentrated exposure of extreme cold and heat.
Symptoms: The symptoms are attributable, in your judgement, to a medically determinable impairment. Patient with history of back and knee pain syndrome and ___ of extremities all considered and RFC reduced to medium, because of pain and fatigue.

**Charles Scharf, M.D., 2/24/03 (Tr. 268)**
Diagnosis:
Axis I: Bipolar I Disorder, Mixed; Alcohol Dependence, in early remission.
Axis II: Personality Disorder NOS
Axis III: Back problems.
Axis IV: Long history of anger problems and alcohol consumption.
Axis V: GAF 50

**Jack Riggs, M.D., 5/24/04 (Tr. 287)**
Assessment: Low back pain, neck pain and numbness.

**Robert Lewis, M.D., 5/12/04 (Tr. 296)**
Impression: This study shows a mild right carpal tunnel syndrome. The decreased left median SNAP amplitude is if of unclear significance. There are mild bilateral ulnar sensory neuropathies, which is worse on the left. There is a left radial sensory neuropathy. Motor nerve conduction studies are within normal limits. F-wave latencies are within normal limits when corrected for the patient's height. There is no evidence of a left cervical radiculopathy. A bilateral brachial plexopathy cannot be excluded.

**Jeffrey Carpenter, M.D., 5/12/04 (Tr. 300)**
Impression: Focal disk herniations of both the protrusion and extrusion type as described above at the C4-5 and C5-6 level. There are causing abnormalities with the central canal as well at the neural foramen on the left at the C5-6 level.

**Jeffrey Carpenter, M.D., 5/12/04 (Tr. 303)**
Impression: Multilevel facet and intervertebral disc degenerative changes as described above. The level most afflicted is the L4-L5 level, where there is a broad-base bulge with overall superimposed disc herniation of the protrusion (possibly extrusion) type. This extends into the central aspect. There is mild central canal and lateral recess stenosis on the left. The L5-S1 level demonstrates a broad-based disc herniation of the protrusion type into the central and left subarticular zones, causing left lateral recess stenosis.

**Johnsey Leef, M.D., 3/19/04 (Tr. 307)**
Impression: Degenerative disc disease and disc space height loss at L4-5 and L5-S1.

**Christopher Schlarb, M.D., 4-22-04 (Tr. 308)**
Impression: No acute abnormalities.

**David J. Withersty, M.D., 2/25/04 (Tr. 317)**
Final Discharge Diagnosis according to Dr. Withersty, treating psychiatrist:
Axis I: Alcohol dependence. Intermittent Explosive Disorder
Axis II: No diagnosis.
Axis III: History of back injury. Abnormal right tympanic membrane. Multiple self-inflicted cuts on forearm.
Axis IV: Legal charges. Relationship problems.
Axis V: GAF 50 at discharge.

**Nitin Malik, M.D., 1/19/04 (Tr. 321)**
Diagnostic Impression
Axis I: Alcohol dependence. Possible Intermittent Explosive Disorder. Rule out Bipolar Disorder. Substance induced depressive disorder.
Axis II: Rule out Borderline Intellectual Functioning.
Axis III: Back injury. Abnormal right TM. Multiple self-inflicted cuts on forearm.
Axis IV: Legal charges. Relationship problems.
Axis V: GAF 40.

**Stephen Elksnis, M.D., 10/31/00 (Tr. 341)**
Impression: Degenerative disc disease and the C5-6 level. No evidence for acute bony injury.

**John Willis, M.D., 8/13/03 (Tr. 345)**
Impressions: Nondiagnostic abdomen with a question of mild hepatomegaly. Clinical correlation is advised.

**John Willis, M.D., 6/21/00 (Tr. 354)**
Impression: Nondiagnostic abdomen.

**Michael D. Morrello, M.S., 9/7/04 (Tr. 362)**

Diagnostic Impression

Axis I: Mood Disorder NOS.  300.02 Generalized Anxiety Disorder. 303.90 Alcohol
Dependence in early remission.

Axis II: V62.89 Borderline Intellectual Functioning.

Axis III: Upper and lower back pain; pinched nerve in his neck; numbness in his arms; carpal
tunnel in both arms; right inguinal hernia; multilevel facet and intervertebral disk
degenerative change.

Axis IV: Occupational problems; economic problems; problems with primary support group.

Axis V: 54


**Cynthia Hagan, M.A., 9/16/04 (Tr. 369)**

Psychiatric Review Technique

Mental Retardation: Mr. Rose __ within the borderline range of intellectual functioning.  Scores
in this area suggest that he may have significant difficulties in work-related function.

Anxiety Related Disorders: Although Mr. Roes does not experience many of the physiological
components of anxiety, the psychological components to meet the "Generalized Anxiety
Disorder" are present.  Results on the BAI, as well as the clinical interview were used to
make this decision.

Substance Addiction Disorders: In the past, while using alcohol, Mr. Rose experienced
significant mood and behavior changes.  However, he reports that he has no used alcohol
in nearly seven months.  Therefore, he is in remission.  Should he relapse, previous mood
and behavior difficulties are likely.

Functional Limitation
Restriction of Activities of Daily Living: Moderate
Difficulties in Maintaining Social Functioning: Moderate
Difficulties in Maintaining Concentration, Persistence or Pace: Moderate
Episodes of Decompensation, each of extended duration: One or Two

Consultant's Notes: Although Mr. Rose does not exhibit symptoms that would lead to a
depressive disorder or Bipolar disorder, he does experience loss of pleasure, self-consciousness,
changes in sleeping patterns, indecisiveness, loss of interest and tremors and fatigue.  It is his
pattern of depressive symptoms that preclude specific diagnosis.  He also reports __ of
hyperactivity.  However, these periods do not substantiate further diagnosis.  Therefore Mood
Disorder NOS is given.


**Cynthia Hagan, M.A., 9/16/07 (Tr. 383)**

Mental Residual Functioning Capacity Assessment

Limitations in understanding, remembering, and carrying out instructions:

Understand and remember short, simple instructions: moderate

Carry out short, simply instructions: moderate

Understand and remember detailed instructions: moderate

Carry out detailed instructions: moderate

Exercise judgment or make simply work-related decisions: moderate
Depressive and anxious symptoms combined with borderline IQ scores leads to the
opinion that Mr. Rose would experience at minimum moderate difficulties in all work

areas.

Limitations in sustaining attention, concentration, persistence, work pace, normal work schedules, normal work routines:

Sustained attention and concentration for extended periods: moderate

Maintaining regular attendance and punctuality: moderate

Completing a normal workday and workweek without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks: moderate

      Borderline IQ scores combined with symptoms of anxiety and depression would likely his    ability to concentrate as well as affect reliability.

Limitations in social functioning in a normal competitive work environment:

Interacting appropriately with the public: moderate

Responding appropriately to direction and criticism from supervisors: moderate

Working on co-ordination with others without being unduly distracted by them: moderate

Working in co-ordination with others without unduly distracting them: moderate

Maintaining acceptable standards of grooming and hygiene: none

Maintaining acceptable standards of courtesy and behavior: moderate

Relating predictably in social situations in the workplace without exhibiting behavioral extremes: moderate

Demonstrating reliability: moderate

Ability to ask simple questions or request assistance from coworkers or supervisors: mild

      Difficulties with maintaining positive mood would affect interaction with others.

      Depressive and anxiety symptoms are likely to contribute to a low frustration tolerance.

Adaptation in a work-setting

Ability to respond to changes in the work setting or work processes: moderate

Ability to be aware of normal hazards and take appropriate precautions: moderate

      Borderline IQ, depressive and anxiety symptoms would likely inhibit his ability to adapt to change. Concentration ___ may affect safety.

Functioning independently in a competitive work-setting

Carrying out an ordinary work routine without special supervision: moderate

Setting realistic goals and making plans independently of others: moderate

Traveling independently in unfamiliar places: moderate

      Due to limited IQ, Mr. Rose would likely require direct supervision to carry out job tasks to satisfaction.

Limitations in work adjustment

Ability to tolerate ordinary work stress: moderate

      Depressive symptoms, anxiety symptoms combined with mood fluctuations decrease frustration tolerance - thus the ability to effectively handle stress.


**Russell King, M.D., 10/6/04 (Tr. 391)**

Impression: No evidence of acute cardiopulmonary disease. Focal area of parenchymal loss and bullous disease in the anteromedial left upper lobe. This may represent sequelae of prior infection versus congenital abnomality such as a focal area of congenital segmental emphysema.

**John Anton, M.D., 9/27/04 (Tr. 392)**

Impression: Near complete resolution of infiltrate within the left lower lobe. Continued radiographic follow up is advised. Please see above comments. I do not see evidence for inflammatory process in the right lower lobe.

**Russell King, M.D., 10/6/04 (Tr. 404)**

Impression: No evidence of parenchymal loss and bullous disease in the antermedial left upper lobe. This may represent sequelae of prior infection versus congenital abnomality such as a focal area of congenital segmental emphysema.

**John Anton, M.D., 9/27/04 (Tr. 405)**

Impression: Near complete resolution of infiltrate within the left lower lobe. Continued radiographic follow up is advised. Please see above comments. I do not see evidence for inflammatory process in the right lower lobe.

**Johnsey Leef, M.D., 9/14/04 (Tr. 406)**

Impression: Areas of air space opacity medial right lower lobe and left lower consistent with developing pneumonia. Follow up PA and lateral chest radiographs recommended in four to six weeks after appropriate treatment has been instituted.

**Sandra Rush, M.D., 12/22/04 (Tr. 416)**

Assessment:

Axis I: Bipolar disorder, Mixed; Alcohol dependence, in remission x 13 months.

Axis II: Personality Disorder NOS.

Axis III: Back problems with recent back surgery; Chronic obstructive pulmonary disease.

**Sandra Rush, M.D., 10/27/04 (Tr. 418)**

Assessment:

Axis I: Bipolar disorder, Mixed; Alcohol dependence, in remission x 11 months.

Axis II: Personality Disorder NOS.

Axis III: Back problems, Chronic obstructive pulmonary disease.

Axis IV: Long history of anger, alcohol problems.

Axis V: GAF of 65

**Warren Boling, M.D., 8/9/04 (Tr. 430)**

Assessment: 1. Discogenic disk disease of the lumbar spine. 2. Bipolar disorder.

**Andrew Mace, M.D., 8/2/04 (Tr. 437)**

Impression: Mild degenerative disk disease with mild posterior bulging of L3-L4 disk. Degenerative disk disease with posterior protrusion and extrusion of L4-L5 disk. Degenerative disk disease with posterior protrusion of L5-S1 disk. Left adrenal mass; evaluation with magnetic resonance imaging or contrast enhanced computed tomography may be useful.

**Jeffrey Carpenter, M.D., 1/31/05 (Tr. 438)**

Impression:
1. Status post microdiscectomy and foraminectomy at the L4-L5 and L5-S1 level with postoperative changes as described above.
2. Broad base disc bulge at the L4-L5 level causing mild neural foraminal stenosis bilaterally.
3. Broad base disc bulge at L5-S1 with a protrusion in the left subarticular space with mild-to-moderate neural foraminal stenosis on the left and mild neural foraminal stenosis on the right.
4. Multiple level facet arthropathy and ligamentum flavum thickening.
5. Stable noncontrast appearance to the left adrenal lesion from the prior examination from August 2, 2004.

**Jeffrey Carpenter, M.D., 1/31/05 (Tr. 441)**

Findings: Examination of the lumbar spine reveals no evidence for compromise of the central canal. The vertebral bodies maintain their proper height and alignment with no evidence for fracture or dislocation. Please refer to the lumbar CT myeogram for a more detailed analysis.

**Michael Morrello, M.S., 2/1/05 (Tr. 462)**

Diagnostic Impression:
Axis I: 296.33 Major Depressive Disorder, Recurrent, Severe; 300.02 Generalized Anxiety Disorder; 303.90 Alcohol Dependence in full remission.
Axis II: V62.89 Borderline Intellectual Functioning.
Axis III: Upper and lower back pain; Pinched nerve in his neck; numbness in his arms; carpal tunnel in both arms; right inguinal hernia; multilevel facet and intervertebral disk degenerative change.
Axis IV: Economic problem: low income; Vocational problem: unemployed.
Axis V: 49

**DDS Physician, 2/1/05 (Tr. 466)**

Psychiatric Review Technique
Categories upon which the medical disposition is based: 12.04 Affective Disordersl 12.06 anxiety-related disorders.
12.04 Affective Disorders: Depressive symptoms characterized by at least four of the following:
      Anhedonia or pervasive loss of interest in almost all activities; Appetite disturbances
with   change in weight; Sleep disturbance; Decreased energy; Feelings of guilt or
      worthlessness; Difficulty concentrating or thinking; Thoughts of suicide.
Mental Retardation: Mr. Rose's full scale IQ scire ranges from the mentally handicapped range
to    the borderline range (68-77) and all of his achievement scores are scores within mental
      handicapped scores. Also, he states his grades in school between "D's" and "F's.
Anxiety Related Disorders: On the BHI-2, he reported anxiety levels that were higher than 99%
      of patients. On the BAI, he scored within the severe range.
Substance Addiction Disorders: Alcohol dependency is in full remission.
Functional Limitation
      Restriction of Activities of Daily Living: Moderate
      Difficulties in Maintaining Social Functioning: Moderate
      Difficulties in Maintaining Concentration, Persistence or Pace: Moderate

Episodes of Decompensation, each of extended duration: One or Two

**Michael Morello, M.S., 2-1-05 (Tr. 479)**
Mental Residual Functioning Capacity Assessment
Limitations in understanding, remembering, and carrying out instructions:
Understand and remember short, simple instructions: moderate
Carry out short, simply instructions: moderate
Understand and remember detailed instructions: marked
Carry out detailed instructions: marked
Exercise judgment or make simple work-related decisions: moderate
> Due to his low cognitive functioning, detailed instructions may be quite difficult for Mr. Rose.

Limitations in sustaining attention, concentration, persistence, work pace, normal work schedules, normal work routines:
Sustained attention and concentration for extended periods: moderate
Maintaining regular attendance and punctuality: moderate
Completing a normal workday and workweek without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks: moderate
> Low cognitive functioning, depressive symptoms, anxious symptoms, would make the above tasks difficult.

Limitations in social functioning in a normal competitive work environment:
Interacting appropriately with the public: moderate
Responding appropriately to direction and criticism from supervisors: moderate
Working on co-ordination with others without being unduly distracted by them: moderate
Working in co-ordination with others without unduly distracting them: moderate
Maintaining acceptable standards of grooming and hygiene: mild
Maintaining acceptable standards of courtesy and behavior: moderate
Relating predictably in social situations in the workplace without exhibiting behavioral extremes: moderate
Demonstrating reliability: moderate
Ability to ask simple questions or request assistance from coworkers or supervisors: mild
> Low cognitive functioning, depressive symptoms and anxious symptoms would social functions difficult.

Adaptation in a work-setting
Ability to respond to changes in the work setting or work processes: moderate
Ability to be aware of normal hazards and take appropriate precautions: mild
> Changes in the work place would more than likely be considered as stress which would probably cause an increase in symptoms.

Functioning independently in a competitive work-setting
Carrying out an ordinary work routine without special supervision: moderate
Setting realistic goals and making plans independently of others: moderate
Traveling independently in unfamiliar places: mild
> Low cognitive functioning, anxious symptoms and depressive symptoms would make it

difficult for Mr. Rose to carry out an ordinary routine and set realistic goals.

Limitations in work adjustment

Ability to tolerate ordinary work stress: marked

Stress would probably be accompanied by an increase in symptoms.

Do you feel that the impairments and limitations which you have identified have probably existed at their current level of severity since 12/31/01, the alleged onset date? Yes.

**Sandra Rush, M.D., 10-27-04 (Tr. 486)**

Assessment:

Axis I: Bipolar I Disorder, Mixed; Alcohol Dependence, in remission x 11 months.

Axis II: Personality Disorder NOS

Axis III: Back problems, chronic obstructive pulmonary disease

Axis IV: Long history of anger, alcohol problems.

Axis V: GAF of 65.

**Rachelle Furby, B.S., C.M., 3/16/05 (Tr. 492)**

Mental Residual Functioning Capacity Assessment

Limitations in understanding, remembering, and carrying out instructions:

Understand and remember short, simple instructions: moderate

Carry out short, simply instructions: moderate

Understand and remember detailed instructions: extreme

Carry out detailed instructions: moderate

Exercise judgment or make simply work-related decisions: marked

Client has difficulty reading and comprehending and concentrating on instructions.

Client is limited from distractions due to depression and anxiety.

Limitations in sustaining attention, concentration, persistence, work pace, normal work schedules, normal work routines:

Sustained attention and concentration for extended periods: moderate

Maintaining regular attendance and punctuality: moderate

Completing a normal workday and workweek without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks: marked

Client has trouble sitting still and can not be in one place for a long period of time.

Observations at appt.

Limitations in social functioning in a normal competitive work environment:

Interacting appropriately with the public: marked

Responding appropriately to direction and criticism from supervisors: marked

Working on co-ordination with others without being unduly distracted by them: marked

Working in co-ordination with others without unduly distracting them: marked

Maintaining acceptable standards of grooming and hygiene: none

Maintaining acceptable standards of courtesy and behavior: none

Relating predictably in social situations in the workplace without exhibiting behavioral extremes: marked

Demonstrating reliability: marked

Ability to ask simple questions or request assistance from coworkers or supervisors: marked
Client has history of anger issues and does not deal well with confrontation. Client displays withdrawal from criticism and confrontation.

Adaptation in a work-setting
Ability to respond to changes in the work setting or work processes: mild
Ability to be aware of normal hazards and take appropriate precautions: moderate
Client displays a lack of concern for safety. Other job related incidents.

Functioning independently in a competitive work-setting
Carrying out an ordinary work routine without special supervision: moderate
Setting realistic goals and making plans independently of others: moderate
Traveling independently in unfamiliar places: moderate
Client has no license and does not drive. Client loses concentration and is distracted.

Limitations in work adjustment
Ability to tolerate ordinary work stress: marked
Client has anger issues in dealing with people. Client is very withdrawn.

Do you feel that the impairments and limitations which you have identified have probably existed at their current level of severity since 12/31/01, the alleged onset date? Yes.

**Rachelle Furby, B.S., C.M., 3/16/05 (Tr. 488)**
Psychiatric Review Technique
Organic Mental Disorders: Disturbance in mood
12.04 Affective Disorders: Anhedonia or pervasive loss of interest in almost all activities; Decreased energy; Feelings of guilt or worthlessness; Difficulty concentrating or thinking.
Anxiety Related Disorders: Client meets many of the generalized anxiety symptoms supported by client report and DSM-IV.
Personality Disorders: Persistent disturbances of mood or affect; Intense and unstable interpersonal relationships and impulsive and damaging behavior.
Substance Addiction Disorders: Listing 12.06 Anxiety related disorders.
Functional Limitation
Restriction of Activities of Daily Living: Marked
Difficulties in Maintaining Social Functioning: Marked
Difficulties in Maintaining Concentration, Persistence or Pace: Moderate
Episodes of Decompensation, each of extended duration: One or Two
Consultant's Notes: Client has been stable on meds in a secure environment such as home, but if confronted or criticized client would decompensate and following previous moods and anger.

**Dr. Frederick L. Polando, 3/24/05 (Tr. 507)**
RFC Assessment
Please describe present diagnosis: lumbar strain.
Does Mr. Rose suffer from any vertebrogenic disorder? Yes
Has Mr. Rose exhibited any of the following?
Significant limitation in motion: Yes

Appropriate radicular distribution of significant motor loss? Yes
Sensory and reflex loss: Yes
In your opinion, would the medical impairments be likely to cause absence from a regular job?
No.
Do you feel this person was incapable of performing any full-time work activity from 12/31/01
through the present? Yes.
If disabled, but not from 12/31/01, on what date do you feel this person became disabled from
full-time work activity? When back injury occurred.

D.    Testimonial Evidence

       Testimony was taken at the February 22, 2005 hearing.  The following portions of the

testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE] (Tr. 586)

Q      Mr. Rose, are you 39?

A      Yes.

Q      And do you have a ninth grade or tenth grade education?

A      I think tenth.

Q      Okay. Can you read and write?

A      Write some, read some.

Q      Do you have a driver's license?

A      Yeah, but they're suspended right now.

Q      And what happened them?

A      DUI.

                              *           *           *

Q      Okay. Are you right or left handed?

A      Right.

Q      Do you have any income coming in at all?

17

A	No.

Q	How are you paying, do you live in a house or apartment or mobile home?

A	House, mobile home.

Q	Okay. Do you have to pay rent on it?

A	No.

*            *            *

[EXAMINATION OF CLAIMANT BY ATTORNEY] (Tr. 593)

Q	Now, a little bit more about your education. Do you handle the paperwork yourself?

A	No.

Q	Okay. Now, do I understand that you can read a little bit, but not well enough to get by --

A	Yeah.

Q	-- as far as filling out forms and things like that?

A	Yes.

Q	Did you fill out any of the forms yourself --

A	No.

Q	-- in the file?

A	No.

Q	So someone else always did that for you?

A	Yeah.

Q	Okay. All right. Now, getting back to your back, was there a time that you weren't able to get any medical attention on your back?

A	Yeah.

Q       How long had you had trouble with your back?

A       Trouble with it ever since I was about 11.

Q       So almost all your life --

A       Yeah.

Q       -- you've had trouble with it. Did it get any worse in recent years?

A       Yeah.

Q       After you were released from the hospital, was that when you obtained some treatment for your back? After Sharp?

A       Yeah. Yeah.

Q       Okay. Before that time, you're indicating that you were having trouble with it, you just weren't able to find out what.

A       Yes.

Q       Okay. Now, before you had the surgery, where was the pain in your back?

A       Low back.

                        *               *               *

Q       Okay. Now, before your surgery, were you limited in what you could do as far as sitting and standing and walking?

A       Yeah.

Q       Okay. Approximately, how long do you think that you could have sat before you needed to get up and move around?

A       Probably half hour.

Q       Okay.  And when you had to get up, what was the reason that you had to get up?

A       Back hurting.

Q       Okay. Now, what about standing, and I mean, like standing maybe in a check-out line in the grocery store, or something like that, standing at the kitchen stove? About how long could you stand before you'd need t o get off your feet ? Now, this is before your surgery.

A       About 20 minutes.

Q       Okay. So a little bit less than sitting, so standing was a little bit harder on you than --

A       Yeah.

Q       - - than the sitting. Okay. What about walking? If you were just taking your time and walking at your own pace, not up hill or anything, just on the level, how long or how far do you think you could walk before you'd need to get off your feet and rest?

A       Maybe a quarter.

Q       I'm sorry?

A       Maybe a quarter or a mile, maybe less.

Q       Quarter of a mile? Okay. And what was the reason for that? What would bother you that would cause you to have to stop and - -

A       Leg.

Q       And that was your left leg?

A       Yeah.

Q       Now, do I understand you really didn't have any trouble with your right leg?

A       That didn't happen.

Q       Okay. And did the left leg ever tend to collapse or go out on you?

A       Yeah.

Q        Was there any difficulty with falling?

A        Stumbling, didn't fall.

Q        Just stumbling? Okay. But you never did fall clear down to the --

A        No.

Q        -- [INAUDIBLE] or anything? Okay. What about things like bending over and stooping down? Any particular trouble with bending at the waist before your surgery?

A        Yeah.

Q        Okay. Let's say things like putting your shoes and socks on, and getting dressed, did you have any difficulty bending over to get your shoes and socks on, or could you do that okay?

A        Yeah, I could do that.

Q        Okay.

A        [INAUDIBLE] --

Q        You didn't have to have any help from anybody --

A        No.

*Q*        -- for that? Okay. Let's say you would drop something on the floor and need to get it, did you have any difficulty getting down and picking up something?

A        I had trouble straightening up.

Q        Okay. So getting down, it was hard to get up?

A        Yeah.

Q        Was it painful?

A        Yeah.

Q        What about lifting and carrying? Were you limited as far as what you would be able to

pick up and carry?

A      Yeah.

Q      Okay. Do you have any, just thinking back on what you were able to do, think about things that you may have done around the house, or carrying in groceries, or anything like that, could you tell me approximately how much you could lift and carry back then on a, you know, fairly regular basis, say, off and on all day?

A      I can't tell.

Q      All right. Well, let's think about that then. How about a cup of coffee. No problem with that?

A      No. No --

Q      Okay. What about a gallon of milk?

A      Ain't no problem with a gallon of milk.

Q      All right. How about two gallons of milk?

A      No problem with that.

Q      Okay.  What about three gallons of milk?

A      No.

Q      You couldn't do that? Okay. And this is before your surgery, how often do you think you could lift, let's talk about a box that had two gallons of milk in it, how often do you think you could pick up or lift two gallons of milk in a day? Just an ordinary day.

A      About four.

Q      Four times? Okay. Now, as far as doing anything like lying down or reclining, did you have to do anything like that before your back surgery'?

A       Yeah.

Q       Could you tell me a little bit about that?

A       I did that, lay down, back started hurting, just laid down.

Q       Was, did you ever have to elevate your feet, or was it just more or less getting your back straightened out'?

A       Getting my back straightened out.

Q       When you did that, how did you do that? Was that on any, like in a bed, or on a couch, or a recliner?

A       Couch mostly.

*              *              *

Q       -- the doorway in your house? Okay. Getting back to lying down or reclining, before you had the back surgery, approximately how long or how often in the course of the day or a week or a month, how often did you have to lie down in order to relieve your pain and rest?

A       Quite often.

Q       Well, give me a, just a general idea of how much quite often means to you

A       About five times a day.

Q       About five times? For about how long at a time?

A       About a half hour, 45 minutes.

Q       Did you sleep or just rest?

A       Just rest, but sometimes I doze off.

Q       Okay. Now, before I ask you about your neck, have you had any improvement after the surgery that you had on your low back?

A       It hurts worse.

                        *               *               *

Q       Okay. Now, you're seeing the pain clinic in April. Is that for the low back or the groin --

A       Yeah.

Q       -- pain?

A       Low back.

Q       Low back? Okay. Now, on a scale from zero to ten, now zero is no pain, and ten is bad enough pain that you need to go get a shot, or I mean, it's real, real, that's the worse kind of pain, emergency room pain. Could you give me some idea of where your pain level is most of the time? Now, this is in your low back, or connected with your low back.

A       Probably seven.

Q       Okay. Is that with your medicine?

A       Yeah, it's with.

Q       Would that, is that even if you're allowed to rest?

A       Yeah.

Q       So you're saying no matter what, you're still having a good bit of pain?

A       Yeah.

                        *               *               *

Q       Okay. What about arms? Any arm pain or numbness?

A       It's --

Q       I'm sorry?

A       My forearms.

Q        Okay. Now, you've had several, or actually two EMGs, have you not?

A        Yeah

Q        What did they tell you about your EMGs'?

A        That no damage in forearms.

Q        Okay. Do you have any numbness of tingling in your hands or your fingers?

A        No. Just my arms.

Q        Just your arms. How about your wrists?

A        They hurt.

Q         Do they hurt if you're not using them, you're just sitting still?

A        Every once in a while.

Q        Do they hurt if you use them?

A        Yeah.

                        *                *                *

Q        Both. What about getting out and being around people outside your family, people that you're not related to? Do you get out and socialize with people?

A        No, not very much.

Q        Any particular reason?

A        No.

Q        How about leaving home? How often do you actually leave home and go somewhere?

A        Every other day.

Q        And when you leave, what are your doing when you leave?

A        Shopping.

Q       Okay. And what are you shopping for?

A       What we need at the house.

Q       Okay. You're talking about like errands?

A       Yeah.

Q       When you do that, do you go by yourself?

A       No.

Q       Do you go with your wife?

A       Yes.

Q       Now, when you do that, do you go in the store?

A       Sometimes.

Q       What about sometimes that you don't. Tell me about that?

A       Stay outside.

Q       Any particular reason?

A       No.

*               *               *

[RE-EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE] (Tr. 612)

Q       And the main thing going on with you, I mean, if, is it, your back pain worse than your

bipolar, or is your bipolar worse than your back pain? Does anything stand out ? Is one worse

than the other?

A       Probably back pain.

Q       And you had the surgery at WVU on November ' 04 , and then they did some more

testing then.  And have you seen Dr Bowling since then?

A      Yeah.

Q      And I think Ms. VanNostrand asked you, you're not sure what he said the plan is, but you're getting pain medication right now.

A      Yeah.

Q      Okay. And does that take the edge off did you say, or not?

A      Takes off some.

Q      But it's still a, on a scale of one to ten, what did you say your pain is generally'?

A      Be about an eight.

Q      An eight? Okay And I know you had physical therapy before the surgery. Is there any talk of physical therapy since the surgery/

A      No.

Q      Okay. How much did you lie down yesterday, Mr. Rose? If you can think back to yesterday.

A      About, well about all day.

Q      Is that, was that the case over the weekend too? Do you lie down most of the day, every day?

A      Yeah.

Q      Did you hunt last fall?

A      No.

Q      Did you used to?

A      Used to.

Q      When's the last time you think you went hunting?

A       Been over a year.

Q       And when you did go hunting over a year ago, was it, what kind of hunting'?

A       Deer hunting.

Q       And so, you didn't go at all this last hunting season in November '04 --

A       No.

Q       - - and that was your surgery time, wasn't it?

A       Yeah.

Q       And you think you might have gone the year before that in 11--03?

A       Think I went out once.

Q       Maybe once in the fall of '03? Was it deer hunting?

A       Yeah.

Q       What about fishing? I know you like to fish. Do you still do that?

A       Yeah.

Q       Did you do it before your back surgery last summer and fall?

A       Yeah, I took my stepson camping.

Q       You took your stepson camping? Was it a campsite?

A       [INAUDIBLE].

Q       Is that very far from Webster Springs? Strange Creek, you live in Strange Creek, right?

A       Yeah.

Q        Is that Webster County'?

A       No. Braxton.

Q       Braxton.  Okay.  How far is the campsite in miles?

A       About five

Q       Okay. Real close.

A       Yeah, close by.

Q       Okay. And how many times did you all go fishing last summer at the campsite?

A       Probably about three, four.

Q       Did you get in a boat, or did you do it from the bank?

A       Mostly from the bank.

Q       Sometimes a boat?

A       Yeah. Every once in a while.

Q       Who has a boat?

A       I got a little ten-foot one.

Q       Okay. What about church? Do you still go to the church twice a month, the Baptist church?

A       Yeah, I go to church every Sunday now.

Q       Every Sunday now? Do you have trouble sitting in the services?

A       Yeah.

Q       Do you have to go home sometimes, or do you just tolerate it?

A       Tolerate.

Q       And how long does the service last, Mr. Rose, every Sunday?

A       Hour-and-a-half.

Q       Are you mostly sitting, or do you, can you get up if you want to?

A       Yeah, I get up.

Q       And do you, in fact, get up, like Sunday, did you go two days ago?

A       No, they [INAUDIBLE].

*Q*       Okay. So you don't go every Sunday?

A       No, every one the second [INAUDIBLE].

Q       Okay. So you go most Sundays. And the last time you went, did you, could you get up if you had to, or do you sit there the whole time and tolerate ir?

A       No, I get up.

Q       Okay. Do you do anything else associated with the church besides go to church?

A        Just go to church [INAUDIBLE].

Q       You do any ministry or anything like that?

A       No.

*Q*       Do you have friends?

A       Yeah.

Q       How many friends would you say you have?

A       I've got quite a few.

Q       What do y'all do?

A       No, I just talk with them, see them.

Q       Do they come by your house, or you go by theirs?

A       Yeah, they stop by my house most the time.

Q       Okay. How old's your stepson?

A       Sixteen.

Q       Okay. Is he in high school there in Braxton County?

A       Yeah.

Q       Is he in any sports?

A       No.

Q       When you go shopping, Mr. Rose, when you told Ms, VanNostrand you go shopping,

what store do you go to? Is it like a Wal-Mart or something like that?

A       Every once in a while, we go to Wal-Mart.

Q       It's a what, sir?

A       Every once in a while, we go to Wal-Mart.

Q       Okay. Do you ever cook at home?

A       Just a little bit.

Q       Okay. What's your specialty?

A       Depends on what they want to eat.

Q       Did you cook yesterday, on Monday?

A       No.

Q       Okay. Okay. And did you do any yard work around the mobile home last summer?

A       That, boys did.

Q       Okay.

                        *               *               *


[EXAMINATION OF MRS. ROSE BY ATTORNEY] (Tr. 619)

Q       Now, Mrs. Rose, you've been in the room, and you've heard your husband testify, have

you not?

A       Yes.

Q       Okay. And I'd like to just ask you if you have anything to add.  And as I said, your husband, he appears to be a man of few words, and I'd like maybe for you to elaborate a little bit on some of the things that we've talked about.  Could you tell me anything about what he does around the house or in the yard, or any kind of repairs on your mobile home, anything like that.

A       He's not able to do a whole lot.  Maybe change a light bulb.  He thawed out the pipes this last, but it's been a few weeks ago when we had the really cold spell.

Q       Uh-huh.

A       He thawed the pipes out.  The pipes froze.  But it was, he put a heater in the bathroom sink, and that was all there was.

Q       Okay. Have you noticed whether or not he has any difficulty using his hands?

A       Yeah.

Q       Could you tell me about that?

A       Just moving his hands, he has a hard time moving them, grasping things sometimes, especially small objects.  He has a hard time doing that.  And I notice a lot of times, he'll complain about the soreness in his hands, or I can see him trying to flex his hands, kind of work the soreness out.

Q       Okay. What about what he was talking about cooking and shopping, things like that?

A       He doesn't cook a whole lot.

Q       When he cooks, what sorts of things does he cook?

A       Simple things, maybe hot dogs, hamburgers,.

Q       [INAUDIBLE] quick things?

A       Yeah. Soup.

Q       Okay. And how often does he do something like that?

A       As needed.

Q       Okay.

A       The nights that I work.

Q       Okay. And what about friends and social activities, things like chat?

A       We both have a lot of friends, but we don't go to our friends' houses. They usually come to ours. If not, then we usually don't see them.

*               *               *

Q       Okay. And how often do people tend to stop by?

A       There's usually at least one or two people a day stop by to see how Lee is doing, see how the kids are doing. You know, just --

Q       They just stop in and --

A       -- chit chat. Yeah.

Q       Okay. Does he tend to have any difficulty as far as getting along with either people in general or family?

A       If there's a lot people in an area, yeah. But if it's maybe just one or two, but the more crowded it gets, the more anxious he gets.

Q       Okay. And as far as going out in the community and shopping, and just doing ordinary things, could you tell me about that, how he gets along?

A       Well, I know he mentioned we go to Wal-Mart every once in a while. We do go once in a while, but he doesn't stay in the store. He'll go in for a few minutes at the most. Maybe he'll go in

and look at what he needs, and he'll go back out. He'll give me the stuff to buy, and then he'll go

back out to the car and sit. And he usually takes his boots off and props his feet up on the dash.

Q        Approximately how long do you usually stay in there when you go?

A         In the store?

Q        Uh-huh.

A        At tops, maybe ten, 15 minutes before he's right back out the door

                              *                    *                    *

Q        All right. Have you noticed anything about his ability to concentrate or pay attention to

one thing at a time [INAUDIBLE!?

A        Yeah, it's hard for him to do. We've tried to sit through a movie before, and either

because of the pain or because he can't concentrate, or most likely both. He'll get up during the

movie, he'll walk around a little bit, come back, and sometimes, one time it took us five times to

watch the same movie because he had to rewind it and start back to where he left off, because it's

so hard for him to keep on track.

Q        Is that a typical situation or is that an unusual situation that you described?

A        Oh, that's typical, that's typical          .

Q        Now, you heard him talk about having to rest or lie down during the daytime.

A        Yes.

Q        Can you comment on that?

A        Nine times out of ten, he's laying down on the couch.  If he's not laying on the couch,

he's walking around the house to try to stretch his legs a little bit.

                              *                    *                    *

Q       All right.  Now, in your opinion, from observing him --

A       Uh-huh.

Q       -- and living with him, the question the Judge asked as far as the severity of the back as opposed to the severity of the bipolar or the nervous condition, do you have any comments about that?

A       It's hard to --

Q       Well --

A       They're both pretty severe, but I 'd  say the back.

Q       Okay.

A       Hiss back pain is really much worse.

Q       Okay. As far as you helping him do things, what sorts of things do you help him do?

A       Well, forms, obviously, I 've helped him fill these forms out, anything that he needs done like that, or if there's something that he doesn't quite understand.  If he gets a letter in the mail, I help read that for him, and do things like that.

Q       How about his medication? Is he able to handle that himself?

A       Yes.

Q       How about appointments or --

A       We keep those, once we get close, we keep them posted on the counter, or I have a black appointment book, and we keep those marked down in there so I can keep track of them.

Q       When you say, we keep them marked down, does he do any marking down in the book'?

A       Not in my black book, on the calendar. On the calendar. Sometimes, he'll mark it down.

                              *               *               *

**[RE-EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE] (Tr. 626)**

Q      First of all, I forgot to ask you, Mr. or Mrs. Rose, do you wear any braces on your hands?

A      Sometimes.

Q      Did you wear them last night?

A      No.

                    *                    *                    *

**[EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE] (Tr. 628)**

Q      Please assume a younger individual with a marginal education, actually a limited education -- I'm sorry -- with a marginal ability to read; precluded from performing all but sedentary work with a sit/stand option with only occasional posturals, such as bending; no hazards or climbing; no temperature extremes; that is unskilled and low stress defined as one- and two-step processes, routine and repetitive tasks; primarily working with things rather than people; entry level. With those limitations, can you describe any work?

A      Yes, Your Honor. At the sedentary level, that hypothetical individual, I believe, could function as a machine tender, sedentary, 141,000 nationally, 1400 regionally. The region's West Virginia, Eastern Ohio, Western Pennsylvania, and Western Maryland. Or assembler, sedentary, 149,000 nationally, 1,450 regionally.

Q      Are those jobs consistent with the DOT?

A      I believe they are, Your Honor.

Q      Mr. Bell, if I added to that hypothetical, it's not clear in the record of any manipulative restrictions, but are those jobs, just generally, the two you named, are they, do they require fine

36

manipulation, just for the record'?

A       Yes.

Q       In the second hypothetical, the claimant testified he lies down most of the day, for example, yesterday.  If he even had to lie down one hour in the a.m, of a typical work day, and one hour in the p.m. of the typical work day, would those jobs be ruled out?

A       Yes.

Q       There is a MRFC of, I think it's Mr. Morello. There's two of them -- Mr. Morello is a psychologist in Exhibit 34, which is somewhat similar to the earlier one in September '04 -- in which it is stated the claimant has moderate limitations in many areas. The -- and Mr Morello did both of them. And the, moderate is defined as follows, Mr. Bell, one-third to two-thirds at a time this task is impacted. If the claimant, one of them that's marked is concentration, and we talked about some of that at the hearing, concentration. If Mr. Rose cannot concentrate one-third to two-thirds of the time as this is defined in this form, are those jobs affected?

A       I believe they would be, Your Honor.

Q       What is the attendance, absenteeism level of the types of jobs you named?

A       If you're going to miss more than two days in a row, then I believe the supervisor would attempt correction and, if not remedied, then result in termination

                        *               *               *


[EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY] (Tr. 630)

Q       And so, I'd like to clarify that with you, Mr. Bell.

A        That wouldn't change my answer.

Q       Would not change the answer. Okay. I'd like to ask you to consider an individual who has no specific breaks that he's going to need, but he's going to need the opportunity to take unscheduled breaks as needed. And this is going to happen on a regular basis. And this would be true -- let's see - - one-third to one-half the time. And so that means that he would be varying punctuality, perhaps leaving work early, and taking breaks during the day because of pain and emotional upset. Would that change your answer?

A       That change my answer to what?

Q       The Judge had phrased a question about taking breaks in a different way.  He said assume one hour morning and afternoon, and I'm saying that --

A       Oh.

Q       -- there's no specific time, but one-third to one-half the time, he's going to be asking for a variation in the schedule.

A       That doesn't sound like it would allow for a regular work routine.

Q       Okay. So not normally provided in competitive employment. Okay. Now, could I have the DOT numbers of the jobs that you identified?

A       An example of the assembler is 713687018.

Q       Okay.

A       And an example of machine tender is 689585018.

Q       As far as the wrist movement, this gentleman has carpal tunnel syndrome and what is described as poly neuropathy in his, in both arms, and it would not be advisable for him to have any kind of repetitive stress on his hands and his wrists, because he already has a condition, and that would make it worse. What kind of grasping and gripping would be involved in these jobs'?

A       You would have to be able to use your hands continually throughout the day, and so if he couldn't have, as you describe, no repetitive stress, then those jobs would be eliminated.

Q       Now, the break schedule that I brought up to you, am I correct in assuming that it would not matter whether this was due to physical pain or emotional --

A       It wouldn't matter, no.

                    *              *              *

E.      Lifestyle Evidence

        The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

•       Helps with childcare of fiance's children.  (Tr. 100)

•       Leaves house three times per week to buy cigarettes.  (Tr. 101)

•       Watches TV, listens to the radio, listens to records and tapes.  (Tr. 101)

•       Has parents visit house daily.  (Tr. 102)

•       Leaves house to visit family once or twice per week.  (Tr. 102)

•       Leaves home every other day.  (Tr. 611)

•       Goes shopping with wife every other day for household items.  (Tr. 612)

•       Went fishing three to four times last summer.  (Tr. 616)

•       Took stepson camping in summer before back surgery.  (Tr. 615)

•       Attends church almost every Sunday.  (Tr. 616-17)

•       Has friends stop by at his house.  (Tr. 617)

•       Cooks at home a little bit.  (Tr. 618)

- When cooks, cooks simple things like hot dogs, hamburgers, soup. (Tr. 620)

- Helps with household repairs. (Tr. 619)

- Sometimes wears braces on his hands. (Tr. 627)

### III. The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant contends the ALJ erred in failing to find that his borderline intellectual function, [BIF], and cervical spinal defects qualified as severe impairments. He also contends his RFC omitted limitations arising from his carpal tunnel impairment. Finally, Claimant alleges the hypothetical given to the Vocational Expert, [VE], inadequately represented Claimant's limitations, specifically his hand limitations and attention/concentration limitations. Commissioner contends the ALJ properly determined the severity of Claimant's BIF and spinal defects, properly determined Claimant's RFC and posed a proper hypothetical to the VE.

B.    The Standards

1.    Summary Judgment. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts

showing that there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

2.      <u>Judicial Review</u>.  Only a final determination of the Commissioner may receive judicial review.  <u>See</u>, 42 U.S.C. §§ 405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir. 1986).

3.      <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that he has a medically determinable impairment that is so severe that it prevents him from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. §§ 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

4.      <u>Social Security - Medically Determinable Impairment</u>.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. §§ 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive disability insurance benefits, an applicant must establish that he was disabled before the expiration of his insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.      <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the

Secretary.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.      <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.      <u>Social Security - Substantial Evidence - Defined</u>.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.      <u>Social Security - Sequential Analysis</u>.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether he has a severe impairment, 3) whether his impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform his past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, he will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform his past work, the burden shifts to the Secretary to show that the claimant can perform some other job.  <u>Rhoderick v. Heckler</u>, 737 F.2d 714-15 (7th Cir. 1984).

C.    Discussion

1.    Whether the ALJ Erred in Concluding Claimant's Borderline Intellectual
Functioning and Cervical Spinal Defects Were Not Severe Impairments.

Claimant alleges the ALJ erred in concluding that his Borderline Intellectual Functioning,

[BIF], and cervical spinal defects were non-severe impairments.  Commissioner contends the

ALJ did conclude Claimant's BIF was a severe impairment and properly concluded Claimant's

spinal defect was not a severe impairment.

An impairment is severe when, whether by itself or in combination with other

impairments, it significantly limits a claimant's physical or mental abilities to perform basic

work activities.  20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).  When

evaluating the effect of a  claimant's subjective symptoms on their ability to work, the ALJ will

evaluate the extent to which the claimant's symptoms "can reasonably be accepted as consistent

with the objective medical evidence and other evidence."  20 C.F.R. § 404.1529; see, generally,

Craig v. Chater, 76 F.3d 585, 592-93 (4th Cir. 1996).  A claimant's pain will not be found

disabling unless "objective medical evidence establish[es] some condition that could reasonably

be expected to produce the pain alleged."  Craig, 76 F.3d at 592.

Regarding Claimant's BIF impairment, this Court agrees with Commissioner that the

ALJ did in fact find Claimant's BIF to be a severe impairment.  (Tr. 24).  Although not finding it

to be severe by itself, the ALJ found Claimant's BIF may have constituted a severe impairment

as of and after August 2003 when combined with Claimant' anxiety-related and depressive

symptoms.  (Tr. 24).  Because a severe impairment may be comprised of a combination of

impairments, each of which are not severe by themselves, the ALJ was within his authority in

making the above determination.  See 20 C.F.R. 404.1523.  Furthermore, the ALJ complied with

the mandates of 20 C.F.R. 404.1523 by considering Claimant's BIF throughout the sequential analysis, despite finding it was not a severe impairment in and of itself. (Tr. 24). Accordingly, Claimant's argument that the ALJ's erroneously determined the severity of his BIF is without merit.

Regarding Claimant's alleged cervical spinal defect, the Court finds there is substantial evidence to support the ALJ's determination that Claimant's cervical spine defects did not give rise to a severe impairment. Although medical evidence establishes Claimant suffered from degenerative disc disease and had bulging at the L4-5 and L5-S1 discs, the ALJ properly concluded the medical evidence did not support the degree of pain and limitation alleged by Claimant. (Tr. 28, 307, 437, 460). First, the Physical RFC Assessment dated December 2003 and March 2004 placed little physical limitation on Claimant and placed him at a medium RFC. (Tr. 202, 256). Additionally, medical records dated October 2000, the date of Claimant's car accident, revealed Claimant's "normal alignment of the cervical spine" and "no evidence for acute bony injury." (Tr. 341). In November 2003, Dr. Sabio observed Claimant's gait was normal and there were no restrictions in the range of motion of Claimant's spine and upper and lower extremities. (Tr. 179). In January 2005, Dr. Carpenter reported "examination of the lumbar spine reveals no evidence for compromise of the central canal. The vertebral bodies maintain their proper height and alignment with no evidence for fracture or dislocation." (Tr. 441). In February 2005, Dr. Boling similarly remarked on Claimant's smooth and steady gate. (Tr. 460). In addition to medical evidence contradicting Claimant's assertions of pain and limitation, Claimant's lifestyle evidence contradicts the degree of pain alleged. For example, Claimant leaves the house to visit family, accompanies his fiancé shopping and helps with

household repairs. (Tr. 102, 615-19). Based on the above medical and lifestyle evidence, there is substantial evidence to support the ALJ's determination that although Claimant suffered from a medically determinable impairment capable of causing pain, the evidence did not support the degree of pain and limitation alleged by Claimant and as such did not significantly limit claimant's work-related abilities.

    2.    <u>Whether the ALJ Failed to Consider Claimant's Carpal Tunnel Limitations When Determining His RFC</u>.

Claimant argues the ALJ erred in determining his Residual Functional Capacity, ["RFC"] because he failed to consider limitations arising from his carpal tunnel impairment. Specifically, he alleges the RFC failed to account for his difficulty grasping and soreness. Commissioner contends the ALJ considered Claimant's carpel tunnel syndrome and properly concluded it not warrant the inclusion of additional limitations in the RFC.

After a claimant has met his burden of showing he is not able to perform his past relevant work, the burden shifts to the Commissioner to show that the claimant is capable of performing a significant number of jobs in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572 (4th Cir. 1976). Prior to such a showing, the ALJ must determine the claimant's RFC and must also note the claimant's age, education and work experience. 20 C.F.R. §§ 404.1520, 404.1545. The RFC is a determination of the most a claimant can do despite his limitations. 20 C.F.R. § 404.1545. A claimant's RFC is to be determined only after the ALJ has considered all the relevant medical evidence of the claimant's impairments as well as descriptions of symptoms (such as pain). <u>Id</u>. at § 404.1529(a); <u>see</u>, <u>also</u>, <u>Hines v. Barnhart</u>, 453 F.3d 559, 563 (4th Cir. 2006).

The ALJ in the present case determined Claimant's carpel tunnel syndrome was a severe

impairment. (Tr. 24). He then concluded Claimant had the following RFC: "since August 2003, the Claimant has had at least the residual functional capacity to perform, within a low stress environment, a range of unskilled, entry level work that: requires no more than a sedentary level of physical exertion; affords the option to either sit or stand; requires no climbing of ladders, ropes of scaffolds but may require other postural activities to be performed at least occasionally; entails no exposure to temperature extremes or to hazards, such as dangerous moving machinery or unprotected heights; consists of routine, repetitive processes and tasks that entail only one-or-two step instruction; and primarily involves things rather than people." (Tr. 38). In determining Claimant's RFC, the ALJ stated he "fully considered" Claimant's carpel tunnel syndrome and noted that Claimant did not wear a brace for his condition nor receive continued medical treatment for his condition. (Tr. 32-33). This Court finds the above RFC and the degree to which it accommodates Claimant's carpel tunnel syndrome is supported by substantial evidence.

Primarily, there is no medical evidence that Claimant's carpal tunnel syndrome gave rise to any limitation requiring additional accommodation in the RFC. To the contrary, medical evidence establishes that Claimant retained normal function of his hands and fingers. For example, Dr. Sabio evaluated Claimant in November 2003 and concluded Claimant's "deep tendon reflexes were normal...fine manipulations were normal." (Tr. 1176). Additionally, both Physical RFC Assessments, dated December 2003 and March 2004, failed to indicate any manipulative limitations. (Tr. 202, 256). Claimant's lifestyle evidence also indicated he retained normal use of his fingers and hands. According to Claimant's reports, he was able to fish, camp, perform household repairs, and play Playstation. (Tr. 364, 615-19). Based on the above medical and lifestyle evidence, there is substantial evidence to support the ALJ's

conclusion that Claimant's carpal tunnel syndrome did not require additional limitations beyond those contained in the RFC.

3. <u>Whether the ALJ's Hypothetical to the Vocational Expert Failed to Adequately Represent All of Claimant's Limitations</u>.

Claimant contends the ALJ's hypothetical posed to the VE failed to adequately represent his hand limitations and his attention/concentration limitations. He argues that as a result of the erroneous hypothetical, the VE cited jobs that required continued use of Claimant's hands and that prohibited Claimant from taking breaks. Commissioner contends the ALJ's hypothetical accurately portrayed all of Claimant's limitations that were supported by the medical evidence.

During step five of the sequential analysis, the ALJ is responsible for reasonably setting forth all of Claimant's impairments in the hypothetical posed to the VE. <u>Walker v. Bowen</u>, 889 F.2d 47, 50 (4th Cir. 1989); SSR 96-5p (1996). The hypothetical must "adequately reflect" a persons's impairments. <u>Johnson v. Barnhart</u>, 434 F.3d 650, 659 (4th Cir. 2005). However, the ALJ's hypothetical need only include those limitations supported by the record. <u>Id.</u>

The ALJ in the present case posed the following hypothetical to the VE: "Please assume a younger individual with a marginal education, actually a limited education - - I'm sorry - - with a marginal ability to read; precluded from performing all but sedentary work with a sit/stand option with only occasional posturals, such as bending; no hazards or climbing; no temperature extremes; that is unskilled with low stress defined as one-and-two step processes, routine and repetitive tasks; primarily working with things rather than people; entry level." (Tr. 628). This Court finds the ALJ's hypothetical adequately reflected Claimant's limitations that were supported by the record.

As established above, the medical and hearing record failed to establish limitations

arising from Claimant's carpal tunnel syndrome. Accordingly, the hypothetical posed to the VE and the resulting jobs cited by the VE "adequately reflected" Claimant's carpel tunnel limitations. Regarding Claimant's attention/concentration limitations, Claimant alleges the hypothetical failed to reflect his "moderate" limitation in the "ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods," as documented in each mental RFC assessment. Claimant is correct that each mental RFC assessment did conclude he suffered from the above limitation. (Tr. 198-200, 252-253, 384, 480, 488). However, a closer look at the final determinations reached by each evaluating psychologist in the mental RFC assessments reveals the hypothetical adequately reflected Claimant's limitations, notwithstanding the above limitation. For example, the DDS Physician in the December 2003 assessment concluded Claimant retained the capacity to "at least understand, remember, and carry out 1-2 step instructions with a very low social interaction demand work setting," despite the above limitation. (Tr. 198). The hypothetical reflected this limitation. (Tr. 628). Similarly, the DDS Physician in the March 2004 assessment concluded were Claimant not alcohol dependent, he retained the mental-emotional capacity to perform unskilled work-related activities. (Tr. 252). While the DDS Physicians in the September 2004, February 2005 and March 2005 assessments concluded Claimant's would have difficulty in the area of concentration and sitting for long periods of time, the hypothetical reflected such limitations by requiring work that is "unskilled with low stress defined as one-and-two step processes, routine, repetitive tasks; primarily working with things rather than people; entry level." (Tr. 383, 628). Accordingly, this Court finds the hypothetical posed to the VE adequately reflected all of

Claimant's limitations to the extent they were supported by the record.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be DENIED because the ALJ properly determined the severity of Claimant's Borderline Intellectual Functioning and cervical spinal defects as well as properly determined Claimant's RFC and posed an accurate hypothetical to the Vocational Expert.

2.      Commissioner's Motion for Summary Judgment be GRANTED because the ALJ properly determined the severity of Claimant's Borderline Intellectual Functioning and cervical spinal defects as well as properly determined Claimant's RFC and posed an accurate hypothetical to the Vocational Expert.


Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: October 29, 2007

                          /s/ James E. Seibert
                          JAMES E. SEIBERT
                          UNITED STATES MAGISTRATE JUDGE